We have one case to be submitted on oral argument on today's docket, State of Texas v. United States. Mr. Boynton. Good morning, and may it please the Court, Brian Boynton for the United States. I'd like to reserve four minutes for rebuttal. There are several issues before the Court this morning. I'd like to start with standing, and then I hope to touch on severability and remedy. This Court previously found that Texas had standing, but that decision has been undermined by intervening Supreme Court precedent. The Supreme Court's... Well, but you know what the Supreme Court keeps telling us in accordance with our rule of orderliness. We don't budge on our past cases unless there's been an unequivocal statement. I mean, I just don't see how you're getting very far with that argument. Obviously, you can spend time on it if you want to, but the Supreme Court has not addressed this particular situation in standing, and they've, in fact, mentioned our prior cases and have discussed whether, for example, special solicitude has been undermined, and it hasn't as shown by one of the special concurrences. So, I mean, go right ahead and spend whatever time you want on it, but I don't understand how you get anywhere with that argument. Thank you, Your Honor. I appreciate that. I believe that the Supreme Court's 2023 immigration priorities case does, in fact, undermine this court's prior decision in three respects, but before I get to that, I want to touch first on the standard under the law of the case doctrine and the rule of orderliness. This court's precedents make clear the Supreme Court does not have to expressly overrule this court's prior precedent. It can implicitly overrule it, and it can demonstrate that the analysis has changed fundamentally, that the Supreme Court is taking to an issue, and that's reason for this court to reconsider. The Bonvillain-Marina case is a great example of this court choosing to pivot in the case of a Supreme Court precedent. I'm sorry, which one? Bonvillain-Marina. It's cited in our brief. So, you're saying even if not explicit abrogation, a dramatic or sea-changing analysis allows us to follow the Supreme Court instead of errant Fifth Circuit law? That's correct, Your Honor. So, how did it undermine the analysis in the 2022 decision that Judge Hainan relied on? Yes. So, first, that decision rested very heavily on special solicitude. The standing section begins with a lengthy discussion of special solicitude, and it ends invoking special solicitude in order to find that Texas has standing. The 2023 immigration priorities case, however, dramatically limits special solicitude. The court in that case, the Supreme Court, rejected precisely the same special solicitude argument that Texas is making here. It held that in order to have a procedural right that is necessary to invoke special solicitude, the party must be invoking a statutory provision that provides a more specific procedural right than the APA's mere authority to challenge final agency action. But that had to do with, that was directed at the exercise of enforcement discretion, not on the validity of a final rule. So, that is the context in which that came up. Texas was bringing an APA challenge to final agency action, so the guidance document there, and the court held that that reliance on the APA was insufficient. It noted that in Massachusetts v. EPA, there was the statutory right under the Clean Air Act to challenge a denial of a petition for rulemaking. And that kind of procedural right, a petition for a rule making is important. The Supreme Court in Massachusetts v. EPA explained why traceability and redressability are relaxed when you have a procedural right. That a party doesn't have to show that it would convince the agency ultimately to change its position if the agency followed the proper procedures. It just has to show that there's some reasonable prospect. Let's, what do you suppose the Supreme Court in footnote 6 in immigration priorities said the issue there, meaning Massachusetts v. EPA, involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the executive's enforcement discretion. There's no reason for that footnote if the court was meaning to undermine the special solicitude as to the situation that we have here. So, we are in fact relying on that same footnote, Your Honor. But, what I would emphasize is the Supreme Court noted that in Massachusetts v. EPA, there was this procedural right to petition for a rulemaking. And that that was not at issue in the case that Texas brought there, challenging the guidance, and it's not at issue here as well. So, this court footnote 6 says Massachusetts v. EPA isn't applicable, basically to this case, immigration. Texas's asserted injury is identical in this case, expenditures spent, as it was in that one. Yes, it's the exact same argument. My own view, but I will explore it with opposing counsel, is special solicitude has been gutted. Our law that briefly went that direction, the Supreme Court's done a huge sea change. But, I am concerned about what I saw as the Supreme Court saying, you're wrong, 8-1 Fifth Circuit, you're saying doctrine's wrong. But, they still do have two negatives. One is footnote 3, there could be a case with indirect injuries, and the other one is that Section C, fourth clause. So, I'd love to hear what you're saying about those two. Yes, I think those are both important as well. I think footnote 3 entirely supports us in this case. There, the Supreme Court makes clear that in our federal system of dual sovereignty, there will frequently be federal policies that have an indirect effect on state expenditures and revenues. But, that's not sufficient to allow a state to challenge any federal policy that has such an effect. The court points to two prior decisions, Massachusetts v. Laird and Florida v. Mellon, that reject standing in a situation where a federal policy obviously had some financial impact on a state, but it was too indirect to support standing. That's precisely the case here. The fiscal injuries that Texas point to have no direct tie to DACA. They rely on health care expenditures and education expenditures. And, these are not expenditures that are tied to someone being a DACA recipient. Any person in the state of Texas, citizen or non-citizen, is entitled to precisely the same types of services, emergency health care services and public K-12 education. It's not a situation where only someone with DACA is entitled to those services. Their theory is entirely population-based. They think that if DACA is rescinded, it will decrease the population of Texas and, therefore, their expenditures will go down. That could be true of any number of federal policies that might change the population in a state, but it cannot be that a federal policy that just changes population gives rise to standing. The Supreme Court's decision makes this crystal clear. It has an example that says that teachers in border states don't have standing to challenge lax immigration policies that might lead to overcrowding in their classroom. The same sort of population effect. Alliance also... The footnote does contemplate a case could be brought. Let's say Texas, as validated by Judge Hainan, had produced the exact same quantified data that New Jersey and the Mieke have in terms of jobs, tax revenue, etc., but all in the negative instead of the positive. Would you still be arguing that that isn't the injury that would be cognizable? So, if these are injuries that relate to jobs that simply flow from the population of Texas changing, then I think that would be... No, if it was DACA recipient-specific. So, I think that it is important to look. There's that CF to Regents that the Supreme Court... Well, but that's Section C. Yes, it is. Let's move to that because that's problematic for you. So, I don't think it is. What the Supreme Court said is there could be a situation in which a program that involves benefits and enforcement could be challenged, but here, Texas's injury, if anything relating to the benefits, is an indirect injury. There's no direct injury. In Regents, it is very different. There were DACA recipients who are challenging the denial of benefits to them. That's a direct injury that flows from a federal program relating to benefits. The Nebraska versus Biden student loan case is another example where there's direct injury from denying a benefit to loan recipients. There, one of the plaintiff states, Missouri, was a loan servicer and had contracts with the Department of Education to service loans, and so when loans were forgiven, Missouri lost money directly. It's that kind of direct effect that could give rise to standing, not the sort of indirect effect that is at issue here. If you're persuasive with that argument, we wouldn't be dismissing. We would be vacating to allow Judge Haynen and Texas to adduce that type of jurisdictional fact? I don't think so, Your Honor. I think Texas had its opportunity to do that here. The Immigration Priorities Decision was issued before Judge Haynen rendered his decision. The parties did supplemental briefing on the effective immigration priorities. Texas never asked to be able to put in new evidence or change its standing theory. I'd like to shift to severability, if I may. The DACA memo did not have a severability provision, and this Court's decision, which turned on procedural flaws as well as substantive flaws, meant that it never needed to address severability. Here, the DACA regulation has a severability provision, and that provision makes very clear that DHS would want a forbearance-only policy to continue if benefits and work authorization were deemed unlawful. Yeah, the severability clause is fairly significant as a change. I agree. Tell us what you think our standard of review is as to the question of severability. So, I believe that would be de novo, Your Honor, that it's a legal question under the test set forth in this Court's National Association of Mining. The first question is whether the agency would intend for the provision to remain intact if other provisions were found invalid. The second question is whether the regulation can function sensibly. Did this Court here fail to apply that test properly? Courts have to balance both, or do they stop at the first if the answer is Congress or the legislature has given its express will to sever? So, under the standard both have to be met, the agency has to indicate that it would want the provision to continue, and the regulation has to function sensibly, but there's deference given to the agency. The National Association of Mining case says it would be only in extraordinary circumstances that you depart from an severability provision. Here the District Court reasons that DHS wouldn't have wanted forbearance only to proceed simply because the agency didn't adopt only forbearance in the first instance. Under the District Court's reasoning, there could never be a severability provision because an agency would have to adopt only the provision they would like severed out and retained. This is important because this Court has never held that forbearance only is unlawful. Page 530 of the prior decision makes clear that that issue had not been reached, and the Regent's decision from the Supreme Court strongly indicates that a forbearance only policy would be lawful. I see my time... We're going to be pretty flexible about the time today. If there's anything else that you'd like to touch on briefly, you may do so, and of course other counsel will be accorded the same privilege. Thank you, Your Honor. I appreciate it. I have a question about the potential injunction. If we're inclined to uphold the District Court's injunction, should we limit it to Texas only, and if so, is that really feasible to limit it just to one state? Thank you, Your Honor. Yes, we do think it would be appropriate to limit any injunction to Texas only. Texas is the only state that has shown injury. Here, there are a number of states who are plaintiffs, but only Texas has tried to show injury. Under the Supreme Court's evolving case law with respect to the propriety of nationwide injunctions, it's very clear that an injunction should be narrowly crafted to provide a remedy only to the party that is injured, and here that would be Texas. We think, though, that this Court should do more than just that with respect to the remedy. The Supreme Court's decision in Regents makes clear that if DACA is found unlawful, that there are remedial steps that the agency, in the first instance, should take. There are important policy decisions that need to be made about how to react to a finding of unlawfulness, and that those are policy decisions the agency should make. Regents recognizes the extraordinary reliance interests that are at stake here. This is a program that's been in place for 12 years. Texas didn't even challenge it for the first six years it was in existence, and you now have hundreds of thousands of people who have voluntarily come forward, provided their information to the federal government, and now structured their lives around this program. And so the Supreme Court recognized in the face of those reliance interests, a remand to DHS would be the appropriate remedy for DHS to craft some kind of wind-down that would address these reliance interests if the Court were to find the program unlawful. The final remedial point I just would like to make is that we have asked that if this Court rules against us and is inclined to affirm that it leave in place the partial stay of the injunction and the vacature, the plaintiffs have not opposed that request that the partial stay remain in place, and so we would ask that the Court, even if it does nothing else, leave that stay in place. I'd be happy to answer any further questions, but otherwise I appreciate your time, and I'll see you for rebuttal. Thank you, Mr. Boynton. Yes, you've saved time for rebuttal. Ms. Perales? Nice to see you again. Nice to see you again. Good morning. May it please the Court, Nina Perales for DACA recipient defendant intervenor appellants. Judge Smith, you asked questions earlier about law of the case, and Mr. Boynton talked about change in law. I would like to start by addressing change in fact, which is another exception to law of the case. The first example is driver's licenses. Texas waived reliance on driver's license costs in this litigation and explained to the District Court that it's because DACA recipients already have driver's licenses. Next. Well, I didn't really refer to the law of the case. I understand that it's reasonable, and it's a, you know, stardesizes in law of the case, and rule of orderliness are certainly closely related, but our rule of orderliness is a lot more strict than law of the case, and this is a different case anyway, so. Thank you, Your Honor. We just don't, we don't have exceptions to the rule of orderliness, as law of the case and stardesizes do have exceptions. We do agree that, with the position of the United States, that a fresh standing analysis is warranted here, and so as not to repeat the argument of Mr. Boynton, I'd like to continue with some of the differences in the fact record. That's fine, and I didn't mean to interrupt your train of thought, but I wanted to point out the distinction. Go ahead. Thank you, Your Honor. Your interruptions are always welcome. In, with respect to education, it is, in order to establish standing to challenge the rule here, Texas continues to rely on education spending on children who arrived in the United States seven years or more too late to be DACA recipients. That's what's in the record, and then, because of the passage of time, it's not possible for Texas to identify K through 12 spending on DACA recipients, because DACA recipients are now age 18 and older. Instead, Texas points to health care spending on the entire undocumented immigrant population as Texas estimates it, not DACA recipients, and with respect to law enforcement, five years ago, Texas abandoned any effort to identify law enforcement costs relevant to DACA recipients. Defendant interveners did not fill the evidentiary vacuum. Dr. Ray Perryman testified he did no study of the costs that DACA recipients impose on Texas. He made no analysis, and he reported no costs of Texas on DACA recipients. Once he had immigration priorities, Judge Hainan did say he pointed, instead of the prior record, to what he said was a DHS admission. Do you recall that? Yes, Your Honor, and we don't believe that the Department of Homeland Security, in the rule as it was promulgated, admitted to any costs that DACA recipients impose on states, and it's been widely understood that DACA recipients overall provide a net benefit to their states. So, no, we don't agree with the court's discussion of that. Finally, I'd like to address the health care testimony of defendant interveners. Defendant interveners, expert on health care, did not identify any health care spending on DACA recipients, and in fact, what he did was predict that if DACA ended, Texas might see increased costs in emergency Medicaid from former DACA recipients who had lost their job. Texas, because of these changes, and because of the record as we see it now, Texas cannot show traceability or redressability, as well as injury, in fact, because Texas, so Texas provided no evidence that a DACA recipient used a state health care program because of DACA, and it's counterintuitive because people who use state emergency Medicaid are indigent. It's counterintuitive because DACA recipients are employment authorized. They can work, they are making money, and they often have health insurance. So, it is not only speculative to try to get from spending at large on undocumented immigrants to DACA recipients because there's no connection there, there's no identified DACA recipients, but it goes against common sense. With respect to redressability, Texas provided no evidence that a DACA recipient who used the state health care program was likely to leave the state of Texas if they lose DACA, right? That's yet another speculative hop in a causal chain that just doesn't hang together. Texas' expert couldn't provide an estimate of the number. Well, on that point, sort of the speculative hops, as I understood our 2022 decision that Judge Hainan said he was bound by, those hops were allowed because special solicitude, according to the Supreme Court, was given to tech states, the verence patriae special solicitude. You What is your view as to whether special solicitude is still given to states when they're challenging immigration policy after immigration priorities? Well, this court has recognized that special solicitude has fallen into disfavor. That's Netflix versus Babin, and especially here where we have immigration priorities, and immigration priorities tells us that special solicitude is challenging a non-enforcement decision of the federal government. We would add to Mr. Boynton's remarks this perspective. The panel in DACA memo, the 2022 panel, noted that Texas' argument on redressability turns on DACA recipients losing DACA and leaving the state, as Mr. Boynton explained, that DACA recipients departing. And the reason that Texas says DACA recipients would depart is because they become arrestable. And so removing the protection of discretion of enforcement discretion from DACA recipients, making them go from not arrestable to arrestable, is at the core of Texas' redressability theory. So even though immigration priority says, well maybe there could be a different standing analysis if there was benefits involved, Texas doesn't rely on any of the so-called benefits from DACA for its standing theory here. It is squarely the same type of standing theory that was rejected in immigration priorities, which is the decision of the federal government to decide to place somebody on the side and say this person is not going to be arrestable. Before your time's up, would you push back on the government's suggestion that if we uphold the DACA term, it should still apply to Texas and the 106,000 DACA residents there? Or do you agree that we should follow the Fourth Circuit and the Sixth Circuit and narrowly tailor, instead of doing the entire United States and the 22 states that are hopeful to keep the DACA program? Certainly not the entire United States or even Texas. We believe there should be a demand without vacater. We believe that vacater and injunctions are both covered by 8 U.S.C. 1252 F1. Is there anything else you'd like to address? One last point that we would like to make. We do have a difference with the United States on the question of severability. We can see that maybe the two steps of the test are met here, but we don't think that the rule is actually severable because the rule is about non-enforcement. In order for the court to strip DACA recipients of employment authorization, the court would be affecting other regulations that have been in effect since the 1980s, the employment authorization regulations. In order to strip driver's licenses from DACA recipients, the court would have to go in and rewrite the Real ID Act, which expressly says that deferred action recipients should be able to apply. And finally, the court would have to go in and rewrite the William Wilberforce Trafficking Victims Protection Act, which again, expressly talks about deferred action recipients and says that they can expressly talk about people who can apply for deferred action while they're going through the process of trying to get a visa. DACA recipients find themselves in all of those positions because they are recipients of deferred action, and it's just very difficult for us to understand how the court could make a severability order that actually functions here. Thank you, Ms. Burrows. Thank you, Your Honor. Okay, for the state of New Jersey, we're happy to have you here, but I don't know how to pronounce your name and I'll mess it up, so I'll let you... I get this with some frequency, Your Honor. Feigenbaum. Mr. Feigenbaum. Thank you very much, Your Honor. May it please the court. Jeremy Feigenbaum for New Jersey. In line with this court's questions this morning and consistent with our briefing, I'll be focusing on the remedial stage. This court must decide for the first time what remedy is warranted at the end of this case, given that plaintiffs failed to challenge DACA for almost six years and that extraordinary reliance interest therefore developed, not just for 600,000 current DACA recipients, but for their 250,000 US citizen children, for the states that embrace and do not challenge DACA, and for the businesses that DACA recipients have started and the businesses that employed them. In assessing the remedial question, I have three primary points today. First, in crafting the scope of its remedial order, which terminates DACA in full for all current recipients all at once, the district court failed to accommodate these reliance interests and it failed to account for plaintiff's unexplained delay. Second, the district court instead should have adopted an order to protect these interests directly or allow DHS to do so in the first instance. And third, Texas's argument that these remedial issues were resolved by DACA 1, I think an homage to Judge Smith's questions about the rules of orderliness, have no purchase at the remedial stage because the final rule had kicked in by the time of DACA 1 and had protected these interests at that time. So I'll begin with the delay that I think makes this case quite unique and makes it so distinguishable from the DACA decision issued by this court some number of years ago. Was that argued below? I'm so sorry, Your Honor. Did you argue the delay issue? We did discuss delay below and we discussed it repeatedly in our briefing, so I think one of the primary cases that's helpful on the delay point is the Petrella versus MGM case that we cite in our briefing. So what the court explained in the Petrella case is that when a plaintiff files within a statute of limitations period, the formal doctrine of latches is not going to bar their claim because they fit within the statute of limitations period. But if there's a long and unexplained delay and that delay has produced profound reliance equities on the other side, then it may still bar certain forms of relief. As the Supreme Court said, it may curtail or affect the available relief at that point because some forms of relief become too disruptive. And so I think this is a perfect example in this case. Plaintiffs filed a challenge to DACA 45 days before the six-year APA statute of limitations had run out. Had they filed 46 days later, everyone would agree that although the merits of DACA are exactly the same in that situation, they'd be entitled to no relief. And our basic submission under Petrella versus MGM is we don't ignore that delay even if their claims are not fully barred. So 45 days before, extraordinary reliance equities have developed in the interim. We account for that in what remedy is appropriate now, even if we don't actually bar the claims. And so under our remedial proposal, Texas still obtains extraordinary relief. I mean, there was an order of vacater. The order of vacater addressed new would-be DACA participants. And so cap DACA at the size that it currently has is about 600,000 current recipients because those are not the ones that have the same reliance equities. But after this specific form of relief that plaintiffs are now seeking in their belated lawsuit, that specific form of relief is no longer on the table because it would be too disruptive. And I struggle to think about a case... Just so I understand where you're placing your argument, you're saying that Judge Hainan below abused his discretion when he didn't consider these arguments at all? Yeah, so I think there's both an abuse of discretion aspect and a de novo aspect in terms of the legal errors that were committed below. So I do think it's an abuse of discretion not to have grappled with the reliance equities at all in crafting the scope of the order. And so we make this point in our briefing. The district court did admirable work, and we credit the district court for the work that he did to accommodate for reliance interest in the stay pending appeal, the effective date that the order would kick in. The problem is the district court did not consider those same equities in crafting the scope of what remedies should apply at that time, what it would mean for current recipients, whether DHS should have an opportunity to consider those interests first, whether the relief should be nationwide. All of those interests that were in the stay pending appeal effectively went out the window in crafting the scope of the order. And so if this court looks at the order itself, one page is all about for the stay pending appeal these extraordinary equities, and the other page about the scope of the order that's going to kick in when final judgment applies doesn't have any of that acknowledged. So in discussing irreparable harm, the district court says, I find irreparable harm for the same reasons that I found standing. But the presence of Article 3 standing is not the same thing as irreparable harm. Irreparable harm does ask questions about net benefits and net costs, and it does look at questions like unexplained delay. So that's irreparable harm. On balance of the equities, the district court in crafting the scope of the remedy specifically said, I'm only looking at the equities between the federal government and the plaintiff states, and didn't look at New Jersey or the other amici states that Judge Higginson has mentioned this morning, and didn't look at the interests of the actual individual DACA recipients who are being represented here. It's a little unfair just with seconds left, but by not discussing standing, it leaves it uncertain whether New Jersey is thinking, we'd like to retain standing to challenge future executive branch immigration policies. And so, would I be correct that you actually would say you have quantified concrete injury more than Texas has, and therefore you do have standing? Or do you think that there's been a sea change from the immigration priorities, and at minimum the district judge should revisit in light of immigration priorities? So I think the standing theories are different in kind, and this is an important point. I think Mr. Boynton was getting at in discussing the region's reference in immigration priorities. The standing that states in the region's case had, and New Jersey had as an intervener here, are tied to the fact that we have employees right now who would lose their ability to work. We have individuals who lose their ability to do that for the state right now, and that was the theory. It was a direct tie in to what Mr. Boynton was talking about, about direct harm from the loss of benefits, as distinct from indirect harms. New Jersey has never taken a position on Texas's standing. In this case, it's actually pretty common that states tend to not take positions on each other's standing. It doesn't mean we're embracing it one way or the other, but it actually gets to the same point that I wanted to get to on Judge Clement's question earlier about nationwide relief. Our view of nationwide relief, like our view of a number of other doctrines, is that the answer to the appropriate scope of relief is that it depends on the facts, it depends on the record in that case. And so Judge Clement, to your question about the nationwide injunction, I do think that in light of the intervening decisions, like the concurrences in Labrador, like this court's decision in Texas versus Becerra, and the fact that this court for the first time has to grapple with what to do on the final rule, I do think the nationwide injunction simply doesn't hold in this case, because especially as to current recipients, Texas has simply done nothing in this record to explain why it's being injured today from a current DACA recipient who's been a part of DACA since 2012, who lives in New Jersey or lives in New York or what have you, and why Texas is suffering any injury, let alone an injury so profound that it would trump all of these other reliance interests. This is a very different case than DAPA, where DAPA of course did have a nationwide injunction. In that case, Texas and 26 other states had swiftly filed a pre-enforcement challenge before all of these reliance interests developed. This is exactly the opposite, and so the equity is cut in precisely the opposite way. In terms of Fifth Circuit law, the DAPA decision from 2015 can be relied on as to the appropriateness of nationwide injunctions in some cases. Yeah, and our position in New Jersey has never been that nationwide injunctions are never appropriate, and it's never been that nationwide injunctions are always appropriate. It's that whether or not a nationwide injunction is appropriate depends on the particular equities in the case. This is winter. This is a traditional four-factor analysis, and I take that to be the tenor of both this court's decision in Becerra this year and as well from some of the recent opinions coming out of the US Supreme Court. And when you accept that frame, I think this case is a particularly inappropriate one in sharp contrast to DAPA, in which to have this kind of nationwide relief, because we do have these extraordinary reliance interests that have developed that now have to be accommodated in the public interest and in the balance of the equities consideration. And that was my point earlier to Judge Clement about what I thought was missing here in this kind of analysis. I do want to make, if it's all right, you've been very generous with time today, I did want to make one additional point about those reliance interests in this case, because I think that this is a pretty extraordinary case. It's not just the reliance interests of the 600,000 DACA recipients, and in 12 years I do think those reliance interests are pretty exceptional. But we're also talking about 250,000 US citizen children, and in the intervening 12 years, they've come to rely on DACA recipients as the source of their parental income. It's also workers at companies that are owned by CEOs that are DACA recipients, or founders that are DACA recipients. Those US citizen children and those US citizen workers really can't have done anything in the intervening 12 years. They might not know that their CEO is a DACA recipient, they might not even know their parents is a DACA recipient. Certainly, regardless, that's their parent, and they're counting on those individuals for their jobs. They're counting on those individuals as the source of their parental income to pay for their medical bills, to pay for their schooling. None of that had to be addressed in DACA 1, as I've been calling it today, because in DACA 1, that was primarily an order of vacater that took care of the DACA memo, but the final rule had kicked in, as this court made abundantly clear, to protect the interest, those current reliance interests, as it related to the exact situation in which we find ourselves now, the current recipient from the reliance that's been generated. And that order of vacater can't be the end-all be-all, because plaintiffs themselves, on remand from DACA 1, actually acknowledged that there would be some additional remedial work left to do in this case. So at record on Appeal 35385 and 35390, both of which we mentioned in our briefs, Texas acknowledged that notwithstanding the order of vacater, the order of vacater could be tempered with some form of injunction that would narrow the relief and deal with some of the disruption. Texas and New Jersey have very different proposals about what that would look like. They obviously think the relief should be nationwide. New Jersey does not. They think one renewal is good enough. New Jersey does not. But that we're in strong agreement that there's still legal authority beyond DACA 1's order of vacater to continue using the winter factors, considering what remedy would ultimately be appropriate. And I think that could be this court accommodating those reliance equities directly, or I think it could be this court giving DHS an opportunity to do so, because if we're going to start disrupting this reliance, including on a case-by-case basis, I don't see how a court, and I don't see how the district court, could do that for particular individuals, for a degree program, whose children have medical needs at this point, who has a mortgage they need to pay that they won't be able to pay without employment eligibility, to do the hard work of figuring out those questions. I don't see, with all credit to Judge Hayman who's taken this case quite seriously, I don't see how a single district court could possibly do that for 600,000 people, and that's obviously something DHS would need to do in the first instance. If this court does not do our primary submission, which is take care of the reliance by crafting a remedy that protects the status quo for current recipients in the first instance. I see my time has more than expired, if this court does not have other questions. Thank you, Mr. Fagenbaum. Thank you, Your Honor. Mr. Mazzara? May it please the court. Given the rule of orderliness in the law of the case, there are really only two issues for this court to decide today, and those involve the case that we've been calling immigration priorities and severability. The district court should be affirmed on those issues as well, and it's resolution to them. Now, before I get into those two things, I do want to comment on a couple of things that my friends on the other side said. First, with respect to delay, my friend from New Jersey, I mentioned that there was some delay in challenging this policy. Let's be clear that we're here on the DACA rule now, and the DACA rule, once it was issued, that Texas filed a supplemental complaint within months of it being, the final rule being issued. And then the other thing I do want to comment on was the, specifically, with respect to overturning of other, overturning prior Supreme Court opinions with respect to special solicitude in Massachusetts v. EPA. Immigration priorities doesn't say anything about, specifically, overturning anything to do with special solicitude, or... The special concurrence said, why didn't they talk about special solicitude? Isn't that in the special concurrence? Yes, Your Honor. So, now I want to talk about immigration priorities just a little bit. Immigration priorities fails on its own terms. Sorry, not fails, but it's irrelevant on its own terms. As Judge Higginson pointed out before, Section C-4 is fairly clear. It cars out from the holding, you know, an exception to its holding on standing. Basically, a situation like what we have here where there is an enforcement policy combined with a conferral of benefits. Okay, but that's in Section C, the fourth possible exception. So, that's jumping a long way from where Judge Hainan was when he said he felt bound by 2022. If I could step back a little bit and ask you, my, listening to the government, my concern is that IP is a huge sea change in three ways. So, I'll just ask you about these three questions. First, I mean, most obviously, Justice Kavanaugh is rebuking our court with eight justices to one, saying that hereafter, states cannot use district courts to usurp federal immigration policy. And the courts, I'm sure you've read the circuits that have cited immigration priorities, and several of them have pointed out that what is the explicit command now from the serving court is you've got to find a history and tradition of courts being empowered to decide cases of that nature, that is to say U.S. foreign policy. So, my question to you is what case, what would you point to as the history and tradition that allows states to go to a district judge to stop nationwide foreign policy and immigration? Yes, Your Honor. The case we would point to is DAPA and the summary of affirmance in DAPA before the Supreme Court. I would also like to point out, what year was that? I believe it was 2015. Okay, so I'm asking you about history and tradition. I'm going, I'm asking constitutional, we're going back a couple centuries. Is there any history and tradition of states suing to stop immigration foreign policy other than in the last ten years? Your Honor, I think that with immigration priorities, again, I think, I believe it's page 677, it makes clear that it's talking about basically cases where third parties are challenging the enforcement decisions of the executive branch. But Kavanaugh says at the outset, it's a rebuke, it's saying this is bedrock separation of powers law. Case in controversy means something. It means courts don't get embroiled in national political policymaking. So, do you have any case before the 2015 case you cited to me that has a court from a state lawsuit stopping immigration policy nationwide? Your Honor, no, I don't think there's another case that's needed beyond DAPA and the summary of affirmance by the Supreme Court. The other thing that I've noticed the circuit courts are stressing, interpreting immigration priority, is they are saying that the indirect theory of injury for a state, which is what I think the 2022 decision exclusively relied on, they're saying that that's a boundless concept. It was rejected by the Supreme Court. So, I'm asking you to focus only on the theory that Texas asserted that Judge Heenan adopted, which is indirect injury from schools and hospitals. Well, Your Honor, the DACA 1, as my friend from New Jersey was calling it, I think it's called Texas 2 in the DOJ's brief. In DACA 1, they describe the injury to Texas as a direct injury, and it is a direct injury. And that's shown through the survey that I believe New Jersey did of DACA recipients where they, or something like 22.3% of them said that were DACA rescinded, they would return to their countries of origin. And so, that shows that we know that there's a pocketbook cost to Texas with regard to education and medical care. Now, that's just a general cost. Immigration Priorities talks about that. Weren't those the identical injuries asserted in Immigration Priorities? Pocketbook costs based on schools and hospitals who are producing driver's licenses. But there was no direct evidence, for instance, that there is here of the recipients, for example, DACA themselves saying that we are here and we will leave. We are here, we're incurring these costs, and we will leave if DACA is rescinded. Okay. Now, DHS, in what Judge Hayden said was an admission of sufficient injury, said the opposite, said there's scant evidence that that train of logic would work. In other words, the logic is people that are lifelong residents of Texas. If they lose the program, they're going to go back to countries they never lived in? Is that the logic? Your Honor, I don't think there's stronger evidence than the respondents to the survey, which I believe involved over 3,000 respondents. But what's the quantified data as the DACA recipients that if they lose this policy program, they're actually going to leave their jobs, leave the schools, and go back to countries they've never lived in? Where in the record is there anything to support that? Yes, Your Honor, so we cite, I believe it's at ROA 15214 to 15215, where the Wong survey is discussed. Okay, that'll say it's not just a possibility, it's a likelihood these people are going to self-exile. Well, yes, Your Honor. Okay, well, I'll look at that because this does tie into, I thought our court in the 2020 decision that, again, Judge Hayden said he was bound by, said, and I'll quote, especially with the benefit of special solicitude, Texas has established that rescinding DACA would redress its harm. So it does seem to me the ruling is inextricably tied to special solicitude. In the majority, eight justices, do they ever say anything about special solicitude other than in footnote six? Oh, in immigration priority? Yes. No. So that's a pretty big sea change. Our decision that he relies on entirely depended on the generosity of special solicitude and mass EPA gives states to have this hypothetical. But nowhere in the decision reversing our court in the majority is there any mention except in footnote six, which says it doesn't control. Okay, Your Honor, I would like to address a couple of things. Number one, law of the case also applies to facts that were found by the prior panel. And a case on that would be United States v. Lee, 358, F-3rd, 315. And so with respect to the likelihood of DACA recipients departing the state, the first DACA decision, 2022 decision, does address that. Secondly, with regard to saying that especially with special solicitude, the state's position is that does not say necessarily with special solicitude. That's just something that is on top of, like a cherry on top of the fact that we did establish direct injury, which the 2022 decision does say with respect to standing. I thought immigration priorities was looking at exactly the same indirect injuries. Tell me if I'm wrong. In fact, when I think about the facts there, what Judge Hanen was being asked to order the executive to do was to arrest non-citizens. If they're arrested in jail, they can't go to school. They can't go to hospitals. The injury is really obvious and direct. Here, we're not talking about arresting DACA recipients. So the whole logic is just on their own, they're going to banish themselves. Yes, Your Honor. That's what they said, yes. And that's what was found. I found a lot more indirect than the facts that the Supreme Court said eight to one wouldn't suffice. Yes, Your Honor. But under the, well, actually, the state would disagree, and so would the 2022 DACA opinion, which describes them as direct injuries and costs, specifically tying those to the survey and the statements by the DACA recipients themselves, that they would return to their country of origin were DACA rescinded, which also goes to traceability. Now- You read the New Jersey and Amici briefs, correct? I'm sorry, Your Honor? You read the New Jersey and Amici briefs? Yes. And there, they quantify in exacting detail, albeit the benefits, tax revenues, working, housing, everything these residents do. Is Texas unable to come up with data that's the opposite? Your Honor, I mean, that is an issue. And coming up with facts and evidence and presenting before the court is something that happens at the trial court. And what has- Do you object for us to vacate and remand for jurisdictional facts like those that the other states are coming up with to be approved by Texas? Under the rule of orderliness and the law of the case, jurisdiction has already been determined here, and standing has already been established. But then where are those facts? Where are the concrete facts that the Supreme Court is telling us we have to have under footnote three for an immigrant as injury type theory of standing? The concrete facts are described in the 2022 opinion that binds this court, Your Honor. So I actually want to read a paragraph, a short little paragraph here, a couple sentences from immigration priorities itself, because we've been talking about it a lot, and I want to make very clear about something. That this suit, the immigration priority, this ruling, this holding was primarily about enforcement discretion and to have the law have a longstanding rule from the Supreme Court that a third party cannot contest. The court has no standing to challenge the prosecution or non-prosecution of another. Immigration priority says, like Judge Higginson said, the states have not cited any precedent, history, or tradition of courts ordering the executive branch to change its arrest or prosecution policies so that the executive branch makes more arrests or imitates, sorry, initiates more prosecutions. On the contrary, this court has previously ruled the plaintiff lacks standing to bring such a suit. And that's a very general statement. It's not tied just to immigration, all right? And so on its terms, it again carves out a situation like what we have here and what it describes later when we discuss the fourth exception under subsection C. Okay, so I just want to address that briefly. Now, I do want to talk about severability before I address subsection C, because I agree that's a difficult position or statement by the government, I mean for the government. So the Supreme Court has said in section C in two sentences as their fourth possible basis for state standing, forbearance plus benefits might give a state standing. So they, so the court says that that is the fourth possible when you're dealing with, you know, a rule that involves with enforcement discretion. If you tack on to that, that there are these benefits, right, then that, you know, could count on the fact that the case brings standing. Now, Your Honor, sorry, Regents, I think is relevant here because Regents itself says that DACA is not simply a non-enforcement policy. It talks about DACA in the forbearance, not just the conferral of benefits, but forbearance itself is an affirmative immigration, is affirmative immigration relief, and that is discussed, I believe, at page 832 of Regents, which indicates that even the forbearance policy itself under the Supreme Court's precedent is not simply like what you have in immigration priorities, which is a memo which did not require notice and comment, which is a memo that just lays out the enforcement policies for, you know, DHS agents in the field with respect to processing and detaining aliens, illegal aliens. So on several, not on severability yet because I'm just, Judge Heenan did acknowledge that those two sentences in Section C are a new development. He acknowledged that, but the difficulty then for me is he didn't explore it as a theory that would be a new one, forbearance plus benefits, instead of indirect injuries. Instead what he said was, and he said this was crucially important to him, the opinion explains that when a state has standing and can challenge DHS decisions, and he goes on to quote those two sentences. So he states that immigration priority stands for the proposition that this is when states do have standing and can challenge. Do you remember that portion? Yes, Your Honor. Okay, but isn't it true that the one sentence he leaves out is the Supreme Court finishes saying we are not deciding that here. So it's the opposite of Judge Heenan saying that's the Supreme Court telling us when they can challenge and do have standing. Again, I'm going to just point out immigration priorities does not overturn DAPA. It does not overturn Massachusetts v. EPA, and additionally, the standing has already been decided by this court in a prior opinion. I'm just asking whether or not Judge Heenan stated the opposite of what the Supreme Court stated as to the Section C theory. Yes or no? He says the Supreme Court said states do have standing and can challenge, quoting those two sentences, and then he left out the statement by the Supreme Court that it wasn't deciding that. No, Your Honor. I don't think that Judge Heenan is in any way contradicting the Supreme Court and immigration priorities in his ruling below. Now, attempting to turn to severability, again, are there further questions on immigration priorities? With respect to severability, I only have a few things. The state only has a few things to say. The district court, I think, did a great job on addressing severability, but... First, what do you say the standard of review is? Same question I asked the other side. I agree that we agree this didn't overrule, Your Honor. Now, on severability, two things are required, both and. Basically, the agency would have had to adopt the remaining part of the rule without the severed parts, right? If you sever some of the rule and there's some remaining, there has to be basically a determination that they would have adopted that even without the severed parts, okay? And then the second one is, as the counsel on the other side said, does the rest of the rule function sensibly? And the state believed that the district court correctly pointed out with regard to that first step that DHS, in spite of their litigation position, very likely would not have adopted what amounts to an illegal alien registry, right? So if you take out... I'm sorry. On the first point, it's just asking, is the will to sever expressed in the text or not? Is there an express severability clause? There isn't an express severability clause. Yes. Oh, yes, Your Honor. So he's wrong stating that there isn't an express severability clause? No, Your Honor. So there is an express severability clause. Those severability clauses under Reno v. American Civil Liberties Union do not impose any obligation on the federal courts to actually sever a rule. I thought the Supreme Court in Barr said that's outdated. Courts that passed severability clause were courts that weren't following textualism as the statement of a legislative will. I thought the Supreme Court was saying, in today's world, when we're all textualists, we sort of start and stop at what the statement is. And here the statement is, we do want to sever. Yes, Your Honor. There is still, however, a de novo analysis that has to be by this court. And the severability clause does not require this court to decide that, for example, the parts that don't confer benefits, that that can be severed and left. In the SB4 litigation that your office has before us pending now, you're on those briefs, correct? Yes, Your Honor. And of course, I think I'm correctly stating it, that you're urging us to reverse the district court because it looked past an express severability clause. Can you reconcile the two positions that Texas is stating at the same time in our court? Well, Your Honor, that's not this case here, first of all. Second of all, we're talking about a state statute by another sovereign in SB4. Here we're talking about a rule by a subordinate agency within the executive branch where, again, the rules are, I mean, for legislation by a legislative branch and an executive agency. And I think... Is that what Judge Hayden said? I'm sorry, Your Honor. Is that what Judge Hayden said? Judge Hayden looked at the... Did he draw the distinction between the distinction you're now offering as Texas as a way to explain the two positions it's taking at the same time in this court? I don't recall Judge Hayden commenting on SB4 in this case, Your Honor. Even if we get to the second poem, didn't the Supreme Court in Regents answer it when it said that forbearance and benefits are legally distinct and can be decoupled? Your Honor, that dealt with, frankly, a memo that expanded DACA as well. So that was not dealing with the rule here. But even... But the rule and the memo are substantively identical, all right? And what you have when you look at the parts that the party... The parts that perhaps are unconstitutional, for example, or, sorry, unlawful, such as the conferral of benefits here, okay, if you take those out as the remaining part, the forbearance part, right, is that something that the... And this is the first step in the analysis. Is that something the agency would have otherwise, you know, regulated? And again, Texas's position and what Judge Hayden says below is that no. And you can know that from looking at the rule itself. There's some contradictions in the rule. For instance, I believe it's at 87 Federal... Federal... Federal Act 53-811, where the federal government rejects several... Several proposals to have a forbearance-only policy. And they say... Basically, they say that the rule, the regulation, rises and falls on the conferral of benefits. Basically, it's the heart of the rule. And then secondly, again, what's left is basically just a registration system where people who... People who qualify for DACA status can apply and register as DACA recipients, give their home address and, you know, inform the federal government of what they're doing every two years. I mean, that's all that's left. And that's... That doesn't confer anything on anybody. And they don't... If that is what's required for not processing them for removal, I mean, well, then, again, then there would have been a need for a notice in common in immigration priorities. And there was no need for notice in common in immigration priorities because the federal government, the executive branch, has discretion authority. And we're not challenging their discretion authority, and we're not asking the federal government or this court or any court to decide for the executive branch who to process for removal or not. Again, we're just... We're challenging the DACA rule, the affirmative immigration relief that it gives, as what Regent called it, and also the conferral of benefits. And we believe that all those things are tied in tightly, like Judge Hannon says, such that you cannot have one or the other. So are you saying that if the benefit provision is separated from DACA, that that would nullify the forbearance provision? The forbearance provision would be, I mean, a nullity. It's like it was without the benefit. Right. It could... Again, Your Honor, the... In immigration priorities, there were several enforcement memos that said, we're going to... The federal government said that we're going to seek to process for removal or detain certain illegal immigrants over others. And here, I mean, basically, if you take out the conferral of benefits, you kind of have that, but then also, again, this kind of DACA status, but the DACA status doesn't provide anything other than put their name on a federal registry for illegal aliens who meet certain criteria. And so... And that's not necessary for the federal government to decide. That's not a necessary step for the federal government to decide not to pursue them for removal or detention removal. Well, but what they've done is shown immense trust in the United States. They've given their names and their addresses to the U.S. government. Correct? Yes. Makes it pretty easy if the government wants to deport them all. Your Honor, again, that is not something, I mean, Texas is asking for. In this case, because we're not addressing the, frankly, the enforcement policies. I mean, I'm interested to hear that last comment. Texas is not asking that they be told to leave Texas? In this particular case, we're challenging DACA's rule, and we've not contested... Isn't the entire theory of standing based on they will leave? Well, we want it rescinded. Yeah, they will leave on their own account, Your Honor. Texas doesn't want them to go. They're just going to really want to go. On their own terms, Your Honor, and their responses to the survey. Yes, absolutely. Which is what gives us direct costs and brings us standing. And what about the DACA residents all over the rest of the country, specifically the 22 states that have documented how much they're helping the United States and those states? So this is turning to New Jersey's argument. New Jersey's saying, at minimum, Judge Hainan has to look at irreparable harm. Texas is the only state that's even tried to show an injury. 22 states have said, we are documenting the immense net benefit. How could a single judge tell all 22 other states who are so grateful for these people that actually they've all got to leave the United States? How does a single judge have that authority? This is the scope of remedy. Your Honor, that is one thing that there's not been a final judgment. This is an interlocutory appeal. But what's your position on New Jersey's argument? Do you expect it should go back for an irreparable harm assessment? Oh, Texas's position is that this case, that the trial court should be affirmed, and then the case remanded to the trial court for reconsideration in the first instance of how to wind down DACA. And the argument we made below was that, that Texas believes that from basically two years from whenever this case Wind down, but for New Jersey and the states that want these recipients? Yes, with respect to the nationwide scope of the injunction, the evocator, uh, well obviously evocators, uh, the whole rule, but with regard to the nationwide injunction, uh, there has been no, uh, real changes in this case since 2022. And the prior panel ruled on that as well. Uh, and the rule of orderliness, I mean, the, the, there's nothing that this panel's hands are tied with respect to, uh, the nationwide injunction. But we have 22 states, one of them's intervened. That's a pretty big difference. Factual. Uh, again, I, I understand, Your Honor, that your point doesn't change the analysis for the nationwide injunction, uh, or, uh, the effect, the strength of the rule of orderliness. You think the nationwide injunction, hence applied to New Jersey and 21 other states, Texas, the suit here, through one district judge, should have that impact. Just wind it down. I mean, that is typically how the federal system generally works, Your Honor. Not typical. I'm saying, is that your position here? That the state should be remanded back to the district court. Wind down New Jersey and the 21 other states. Oh, I mean, to wind down DACA across this country. Yes, yes, Your Honor, absolutely. Yeah. So, that's why you want the nationwide injunction so the Texas people will have nowhere to go if everything is the same, right? I'm sorry, Your Honor? If, if, if it's a nationwide injunction, then the, the, uh, law would be the same. So the Texas citizens wouldn't move somewhere else because it wouldn't do them any good if everything was the same. Uh, yes, Your Honor. Did, did I hear you say that the state's position is that this panel, uh, is powerless to change the nationwide scope of the injunction? The, because of what law of the case or rule of orderliness or what? Explain that to us again. Uh, yes, Your, yes, Your Honor, because the state's position is that nothing has changed, nothing has substantively changed. Uh, the, uh, below, um, one second, Your Honor. Uh, with respect to, uh, the, uh, injunction below, uh, in the, the first time that the district court addressed its, uh, injunction, it, uh, the parties agreed that the prior injunction covered the rule, um, and then at the very, very end before, uh, I'm sorry, Your Honor. Oh, sorry. Um, and, uh, yeah, Texas's position is that there's been no, no, no change in circumstances, there's been no change in the law, no change in facts, and that, uh, given that, other than, you know, the addition of the severability clause, uh, in the, uh, in the rule, uh, which isn't, we don't think relevant to the nationwide injunction issue, uh, that this, uh, panel is governed by the prior panel's, uh, rulings on those facts and, and the, the model of the law. Even though we're reviewing a new, uh, action by the, by the district court this time? Um, yes, Your Honor. The same thing, the same thing goes with the, with the vacator of the rule, uh, the state believes that, uh, this panel's hands are bind, bound as well. I just, I mean, he vacated the, the memo before, vacated the rule. Hands are bound, but the government, I just want to be clear, Texas isn't saying the whole system crashes when we issue a decision. You absolutely would urge that the stay remain in place through the duration of appeals to the Supreme Court? Texas does not oppose the stay. Does not oppose, but does Texas agree that the stay is appropriate under the Nikin factors? Uh, Texas does not oppose the stay and, uh, has not challenged it, uh, I don't believe, uh, has not challenged it and, uh, probably intends not to challenge it, you know, through the course of the appellate litigation. All right. Have you been able to cover everything that you wanted to, Mr. Bezzara? Uh, yes, Your Honor. All right. Thank you. Yep. Mr. Boynton for rebuttal. Thank you, Your Honor. I'd like to start first with the nationwide scope of relief here. It is extraordinary that Texas thinks that it could shut down DACA in every state across the country based on injuries to Texas. Uh, Your Honor, you raised the possibility that if there weren't nationwide relief, that Texas DACA recipients might leave Texas to go seek and have DACA stay in New Jersey. And I think counsel said, yes, that's what they're hoping to avoid. But their entire theory of standing here is that they want these DACA recipients out of Texas because they claim that these DACA recipients harmed Texas. So, uh, never... How is this any different from the situation, uh, in the, in the DAPA case in terms of the nationwide injunction? Yes. So I think the law has evolved, Your Honor, since then. The Supreme Court has made clear that courts ought to be crafting remedies that are tailored to the parties. I think the best example of that recently that postdates the 2015 decision and the 2022 decision is the decision in Labrador versus Poe, which is cited by the parties. In our brief, we cited the 28-J letter from Texas invoking Labrador, actually in the SB4, uh, case. I'd like to talk also a little bit about severability. Um, Texas's position here is that a forbearance only program isn't workable. Uh, but DHS in the regulation explains at length the benefits from forbearance. Now, of course, DHS also sees benefits from work authorization, uh, and benefits. Uh, but that doesn't mean that DHS thought there was no, uh, benefit to a forbearance only policy. And in fact, DHS explains how it's helpful to the agency for people to come forward who are low priorities for removal, self-identify. That's now in DHS's system. If they encounter these people, they know that they're a low priority for removal and that's actually beneficial for the agency in its functioning. Otherwise it's resident by resident one to time. Correct. Otherwise, when you encounter someone, uh, if you know nothing about them, you have to make an assessment about their dangerousness, uh, all those sorts of factors, uh, one by one. I drew, you heard, a very strong rebuke from the Supreme Court that we've got before courts, single courts dictate U.S. foreign policy. They've got to be able to point to a history and tradition that Article III allows that. He said the duration started in 2015. Do you know of any longer, older, we're talking a century old history? I'm not aware of any. I thought of some of that myself. There's the U.S. versus Arizona case. So that was the United States suing Arizona. There were some cases from the 90s where states tried to bring lawsuits under the invasion, uh, clause. Those were all rejected by the courts of appeals. So I'm not aware of this kind of history. And did the first court ever say the theory of standing for state is the immigrant is an injury? I don't know where that started, uh, but the Supreme Court does not seem to have blessed that. There was some discussion about what to make of this section C of immigration priorities, where it says the analysis could be different if there's an enforcement policy plus a benefit. The first thing to keep in mind is that's a potential exception from this categorical rule the Supreme Court has laid out. So that's an exception just to the categorical rule about enforcement, right? The court says that no one has a judicially recognizable interest in the enforcement of immigration laws against the third party. And then it says there might be some exceptions. That's not an exception to the no indirect effects rule that we see in footnote three. And it's not an exception, uh, to the limitation, the narrowing of special solicitude that we see in footnote six, your honor, you raised the possibility that the narrowing of special solicitude, uh, means only that it can't be invoked in cases that are challenging just enforcement discretion. I don't think that it's admittedly, we're parsing a footnote here. I don't think that's the best reading of the footnote. If that's all the court we're saying was that you can't have special solicitude in a case where you're challenging, uh, enforcement discretion, there would have been no need to say it at all because the court has adopted this broader rule that you can't have standing in such a case. And so there's no need to decide whether the loosening of traceability and redressability should apply if there's just a flat ban, uh, on standing altogether. Um, as for, uh, thank you, your honor. Uh, as for this potential exception where you have a challenge to a policy that has, uh, enforcement discretion plus benefits. So she said, I think you're exactly right that the district court never even analyzed this. This is a could be different, not a would be different, uh, warning from the Supreme court. Uh, and the district court never explained why it ought to be different here. Uh, the court invoked the possibility that a different exception or potential exception, uh, might apply. This is where, uh, the federal government has wholly abandoned, uh, enforcement efforts. And the district court says, well, I didn't reach the take care clause issue. I've never found that Texas has proven wholesale abandonment, uh, but Texas alleged wholesale abandonment. And so that's good enough, but that can't be a basis at summary judgment, uh, for showing standing. And there's never been any evidence of wholesale abandonment for all these reasons. Your honors, we would ask you to reverse the district court at a minimum. We would ask that the partial stay remain in place. Thank you very much for your time. Thank you, Mr. Boyden. Your case is under submission and the court is in recess.